IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 16–cv–01754–KMT

DWIGHT D. YORK, known as Malachi Z. York,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

      Defendant.

---

## ORDER

---

      This matter comes before the court on "Defendant's Motion for Summary Judgment and Memorandum Brief in Support Thereof" (Doc. No. 49 [Mot.], filed August 8, 2017). Plaintiff filed his Response on October 3, 2017 (Doc. No. 55 [Resp.]), and Defendant filed its Reply on October 27, 2017 (Doc. No. 63 [Reply]).

## STATEMENT OF CASE

      Plaintiff, a federal prisoner confined to the United States Penitentiary, Administrative Maximum ("ADX") in Florence, Colorado, asserts one claim for injunctive relief for the defendant's alleged failure to provide him with specific medical care in violation of the cruel and unusual punishment clause of the Eighth Amendment. (*See generally,* Doc. No. 38, Second Am. Compl. [Am. Compl.], filed January 4, 2017.) Plaintiff alleges that he suffers from a life-threatening condition, Hereditary Angioedema ("HAE"), as well as hypertension (high blood pressure), vision and dental problems, and that Defendant's care does not meet minimum

constitutional standards, placing his health and life in jeopardy. (*Id.* at 2, 5, 36–37.) Plaintiff

seeks affirmative injunctive relief from the BOP in the form of additional medical care for his

angioedema in accordance with "community standards of care." (*Id.* at 37.) Plaintiff also seeks

a declaratory judgment that Defendant has violated his Eighth Amendment right to be free from

cruel and unusual punishment. (*Id.*)

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF
## UNDISPUTED MATERIAL FACTS

In his Response, Plaintiff responds to each of Defendant's statements of undisputed material

facts by stating it is (1) admitted, (2) denied, or (3) "is not a material fact and should be stricken."

(*See* Resp. at 1–7.) Pursuant to Federal Rule of Civil Procedure 56(c),

> A party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by:
> (A) citing to particular parts of materials in the record, including depositions,
> documents, electronically stored information, affidavits or declarations, stipulations
> (including those made for purposes of the motion only), admissions, interrogatory
> answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a
> genuine dispute, or that an adverse party cannot produce admissible evidence to
> support the fact.

Fed. R. Civ. P. 56(c)(1). A party also "may object that the material cited to support or dispute a fact

cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address

another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact

undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting

materials—including the facts considered undisputed—show that the movant is entitled to it . . . ."

Fed. R. Civ. P. 56(e)(2)–(3).

Finally, the court should accept as true all material facts asserted and properly supported in the summary judgment motion. *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002). "[O]n a motion for summary judgment, it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record." *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (quotations and citation omitted). The court is "not obligated to comb the record in order to make [Plaintiff's] arguments for him." *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000).

Accordingly, to the extent Plaintiff "denies" facts presented or requests that they be stricken as immaterial and yet fails to provide any evidence in support of the denial or request to strike which contradicts Defendants' evidence, the court considers the facts identified by Defendant as unopposed. Fed. R. Civ. P. 56(e)(2). Nevertheless, although certain facts are deemed admitted, the court still must decide whether the defendant is entitled to judgment as a matter of law based upon the material facts asserted and properly supported in the Motion and applicable legal principles. *See* Fed. R. Civ. P. 56(a), (c), (e)(3); *Reed*, 312 F.3d at 1195–96.

## DEFENDANT'S RESPONSE TO PLAINTIFF'S ADDITIONAL DISPUTED OR UNDISPUTED MATERIAL FACTS

In his Response, Plaintiff sets forth 58 paragraphs of additional disputed or undisputed material facts. (*See* Resp. at 8–13 [Pl.'s Facts].) Defendant disputes the statements of Harvey Cox and Dr. Busse, two of Plaintiff's expert witnesses, because they are not sworn or in the form of an affidavit. (Reply at 7, ¶ 52; 8, ¶ 56.) Defendant also disputes the statements of Mr. Cox because Plaintiff has not provided a necessary foundation for him to testify as an expert. (*Id.* at 8, ¶ 52.) Finally, Defendant disputes the statement of Dr. Busse because it is not presented to a reasonable degree of medical certainty. (Reply at 8, ¶ 57.)

## A.    Sworn Affidavits

The federal system abandoned the requirement for a sworn or certified copy of a paper or a formal affidavit in 2010.  *See* Fed. R. Civ. P. 56, Advisory Committee Notes to 2010 Amendment, Subdivision (c) ("[This requirement] . . . is omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record.  A formal affidavit is no longer required.").  Moreover, the Tenth Circuit has stated that evidence supporting a motion for summary judgment

> need not be submitted in a form that would be admissible at trial.  Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form.  Nonetheless, the content or substance of the evidence must be admissible.  Thus, for example, at summary judgment courts should disregard inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form.

*Agro v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (emphasis in original, internal citations and quotations omitted).  It is only necessary for the party submitting the evidence to show "that it will be possible to put the information, the substance or content of the evidence, into an admissible form."  *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (citation and internal quotation marks omitted).

Because the written reports of Plaintiff's experts set out opinions that are anticipated to be offered in testimony at trial, there is no bar to considering those opinions here.  The court will, however, disregard any statements recorded in the expert reports that would not be otherwise admissible at trial.  *See Agro*, 452 F.3d at 1199.

## B.    Foundation

This court's practice standards require "[a] party objecting to the admissibility of opinion testimony by an expert witness [to] file a written motion seeking its exclusion."  *See* Practice

Standards (Civil Cases), § III.J. "The deadline for filing all such motions shall be the same date as set for the filing of dispositive motions." (*Id.*) Mr. Cox's report is dated February 1, 2017, and was provided to Defendant on February 3, 2017. (*See* Doc. No. 44.) Thus, at this time, Defendant's objection to the inclusion of Mr. Cox as an expert witness or to the inclusion of his report is overruled.[1]

## C. *Reasonable Degree of Medical Certainty*

Defendant argues that Dr. Busse's opinion is not presented to a reasonable degree of medical certainty and that she only hypothesizes that Plaintiff could suffer from an airway attack. (Reply at 8, ¶ 57.)

Federal Rule of Evidence 702 "imposes on the district court a gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.' " *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). To execute that function, the court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592–93). Defendant has not seriously called into question the "reasoning and methodology underlying [Dr. Busse's] opinion," *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003). Rather, Plaintiff questions the validity of the opinion in the guise of attacking its admissibility.

---

[1] Defendant cites *Squires v. Goodwin*, 829 F. Supp. 2d 1041 (D. Colo. 2011), in support of his contention that the court, when reviewing summary judgment, may look to determine the basis for an expert opinion and analyze the adequacy of its foundation. (*See* Reply at 8, ¶ 52.) However, in *Squires*, the court did not analyze the sufficiency of the expert on summary judgment, but rather on a properly-filed motion to strike the expert under Rule 702. 892 F. Supp. 2d at 1046-47.

"While expert opinions 'must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, . . . absolute certainty is not required.' " *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003) (citation omitted). *See also Warren v. Tastove*, 240 F. App'x 771, 773 (10th Cir. 2007) (requiring that "an opining physician . . . offer an opinion with a reasonable degree of medical certainty" and noting that "a hunch, even an educated hunch, is not enough"). Nevertheless, the fact that a physician may not be able to testify to a reasonable degree of medical certainty goes to the weight a testimony, not to its admissibility. *In re Swine Flu Immunization Prod. Liab. Litig.*, 533 F. Supp. 567, 578 (D. Colo. 1980) (citing *United States v. Cyphers*, 553 F.2d 1064 (7th Cir. 1977).

To the extent Defendant seeks to undermine the correctness of Dr. Busse's opinion, it may do so through normal means at trial. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Defendant's objection to Dr. Busse's opinion at this stage, however, is overruled.

## UNDISPUTED FACTS[2]

### *General Background and BOP Procedures*

1.      The BOP maintains electronic medical records for each inmate, which are referred to as BEMR (Bureau Electronic Medical Records). (Mot., Ex. A, Decl. of Stacy Collins, Health Services Administrator ["HAS"], ¶ 4.)

---

[2] Some of the factual assertions related to Plaintiff's medical history and medical records in his Statement of Additional Disputed or Undisputed Material Facts are made without citation to specific pages of an exhibit. This is contrary to Rule 56(c), which requires a party asserting a fact to cite to particular parts of materials in the record. Fed. R. Civ. P.(c)(1)(A). As noted *supra*, it is not the court's obligation "to comb the record in order to make [Plaintiff's] arguments for [him]." *Mitchell*, 218 F.3d at 1199. As such, to the extent Plaintiff asserts facts that cannot be easily verified by citation to the record, the court has not included them as undisputed facts.

2.      Medical care for inmates, including Plaintiff, is governed by Bureau Program Statement 6031.04, Patient Care.  (*Id.*, ¶ 8.)

3.      The BOP seeks to provide health care to inmates in accordance with proven standards of care without compromising public safety concerns inherent to the agency's overall mission.  (*Id.*, Attach. 4, Program Statement PS 6031.04, at 2.)

4.      The BOP provides five major levels of care that guide medical providers on how to triage inmates' needs.  (*Id.*)

5.      First, there are conditions that are "medically necessary – acute or emergent."  (*Id.* at 5.)  These can include such conditions as myocardial infarction, hemorrhage or stroke, and other conditions "that are of an immediate, acute or emergent nature, which without care would cause rapid deterioration of the inmate's health, significant irreversibly loss of function, or may be life-threatening."  (*Id.*)

6.      The next level of classification includes those conditions that are "medically necessary – non-emergent." (*Id.* at 6)  These are conditions that are not immediately life threatening but that could lead to significant deterioration or irreversible damage in the absence of treatment; this category can include such conditions as HIV, cancer, or chronic conditions like diabetes, heart disease, or serious mental illness.  (*Id.*)  Plaintiff is classified as a Care Level 2.  (Ex. A, ¶ 32.)

7.      The next level is "medically acceptable – not always necessary."  (*Id.*)  This level includes conditions that are considered elective procedures, when treatment may improve the inmate's quality of life.  (*Id.*)  Relevant examples in this category can include joint replacement or treatment of non-cancerous skin conditions.  (*Id.*)

8.      Finally, there are two lower categories of care: "limited medical value" and "extraordinary."  (*Id.*)

9.      At the ADX, Plaintiff has multiple avenues to access medical care (daily if needed). (*Id.*, ¶ 9; Attach. 4 at 21.)  Health Services providers at the ADX include Mid-Level Providers, Registered Nurses, Emergency Medical Technicians, and physicians.  (*Id.*; Attach. 4 at 14.)  Medical units have an EKG machine, blood-pressure monitor, and Automated External Defibrillators.  (*Id.*; Ex. A, ¶ 9.)  Each facility, including the ADX, is equipped to provide primary health care, dental care, and emergency care and basic first aid to an inmate-patient.  (*Id.*, ¶ 17; Attach. 6, Complex Supplement FCC 6031.01(4)g, *Urgent Medical and Dental Services*, § 4.)

10.      Depending on a patient's needs and subjective complaints, a provider can assess and examine a patient in his cell or at other locations.  (*Id.*, ¶ 10; Attach. 5, Complex Supplement FCC 6031.01(3)g, *Triage/Access to Care*, § 2.)  If the examination is in a cell, the outer door can be opened so that the provider may speak to the inmate patient face-to-face while also taking vital signs, such as blood pressure readings.  (*Id.*; Attach. 5, § A.1.d.)

11.      Health Services staff make daily rounds of the housing units at the ADX to attend to inmates' medical needs.  (*Id.*, ¶ 11; Attach. 5, § 6.A.1.b.)  Health Services staff walk down all ranges and verify the well-being of each inmate.  (*Id.*)  Inmates may address medical issues during these rounds.  (*Id.*)  Health Services staff will determine if the issue must be addressed at that time or if the issue may be deferred to a later time.  (*Id.*)  At the ADX, these rounds will start during morning-watch, based on the availability of open ranges.  (*Id.*)  At the ADX, all routine sick call appointments will be conducted in the unit unless clinical staff determines care must be continued in the Health Services Unit examination areas.  (*Id.*; § A.1.d.)

12.      If the patient requires a clinical encounter that is more extensive in nature or more extended in duration, the patient will be scheduled for escort to an exam room in the respective housing unit.  (*Id.*, ¶ 12; § 6.A.1.c.)  That examination room is contained within the housing unit, and

it includes a gurney and other items one would typically find in the exam room of a primary care physician outside the correctional environment. (*Id.*, § 12.)

13.     A patient can be seen in the Health Services Department, away from the housing units, if even more invasive or complex treatment is required, including dental services, laboratory services, and radiology services, among others.  .  (*Id.*, ¶ 13; Attach. 4 at 3.)  If the Health Services Department at ADX Florence cannot provide the requisite level or degree of care for the patient's specific condition or complaint, the inmate can be referred to an outside specialist. (*Id.*, ¶ 14; Attach 4 at 7.)  Where an inmate presents with a condition possibly requiring outside consultation, a body called the Utilization Review Committee (URC) considers the need for that medical procedure or evaluation. (*Id.*, ¶ 15; Attach. 4 at 7.)  The Clinical Director chairs the URC, which includes the HSA, the medical trip coordinator, and the medical provider, among others. (*Id.*)  The URC reviews and decides whether to refer the inmate to an outside medical, surgical, or dental specialist. (*Id.*) Any care that is considered "medically necessary – acute or emergent" does not require URC review or approval prior to the treatment being provided. (*Id.*; Attach. 4 at 8.)  As chair of the committee, the Clinical Director is the final authority for all URC decisions. (*Id.*)  The Clinical Director will notify inmates in writing when URC decisions are made with a copy of the notification placed in the inmate's health record. (*Id.*)

14.     An inmate can write an Inmate Request to Staff (a "copout") to request medical care. (*Id.*, ¶ 16; Attach. 4 at 21.)  An inmate can refer medical concerns or questions to any one of the many staff members who conduct rounds on a daily basis: this includes, but is not limited to, Health Services, Executive Staff, Correctional Services, and the correctional officers in the unit. (*Id.*, ¶ 16.) An inmate also can request to be seen during sick call by the medical provider. (*Id.*)

15.     Inmates with chronic medical conditions, are also seen at the Chronic Care Clinic at designated intervals.  (*Id.*, ¶ 18; Attach. 4 at 18.)  At that appointment, the clinician devotes time solely to those chronic conditions for which the inmate is treated.  (*Id.*, ¶ 18.)

16.     Before a pharmacist at ADX dispenses medication to an inmate, the pharmacist will review it prospectively for adverse interactions with other drugs, contraindications, and the inmate's drug allergies, among other things.  (*Id.*, ¶ 19.)  The patient is educated on any side effects of the prescription, the proper dosage and frequency, and the medical need to continue with the medication. (*Id.*)

17.     ADX is equipped and staffed to provide 24-hour medical, dental and mental health care.  (*Id.*, ¶ 20; Attach. 6, § 4.)  A team of "first responders" is established for each shift, with documented training in first aid and CPR.  (*Id.*)  All health care practitioners, the HSA, AHSAs (Assistant Health Services Administrator), and Lieutenants maintain CPR and AED certification. (*Id.*)

18.     If a medical emergency occurs during regular hours, Health Services staff are alerted and notified by telephone or via radio.  (*Id.*, ¶ 21; § 4.B.1.)  Health Services staff retrieve the emergency medical bag, and immediately report, within four-minutes, to the location of the emergency, as directed by the first responder, Lieutenant, or Control Room Officer.  (*Id.*)  Immediate triage and quick assessment of illness or injury is performed at the site of the emergency.  (*Id.*)  First responders initiate first aid, administer CPR, and utilize an AED, as necessary.  (*Id.*)  The inmate may be transported via wheelchair, stretcher/gurney, or emergency medical vehicle to the Health Services Urgent Care Room.  (*Id.*)  If the inmate's condition requires immediate transfer to a local community hospital emergency department, medical staff notify the Operations Lieutenant, or Control Room Officer, and the Emergency Medical System is activated by calling 911.  (*Id.*)  In

responding to a medical emergency, staff are trained in a four-minute response protocol. (*Id.*, ¶ 22; § 4.) Staff use the AED machine to ascertain the patient's readings and can administer oxygen if needed. (*Id.*)

19.     An ADX inmate interacts frequently with medical staff or other employees who can quickly refer the inmate's concern to Health Services. (*Id.*, ¶ 23.) This level of staff and inmate interaction is highest during the day shift, from approximately 7 a.m. to 4 p.m. (*Id.*; Attach. 6, § 4.B.1.) During off-hours, however, an ADX inmate still has opportunity to access medical care despite the fact that he is confined to the cell overnight and without a cellmate. (*Id.*; § 4.B.2.)

20.     All ADX cells are equipped with a duress button that the inmate may press if he is experiencing a medical emergency. (*Id.*, ¶ 24.) This button is on the wall of his cell where he can easily reach it. (*Id.*) If the inmate engages his duress button, correctional officers in the unit will respond immediately to determine the nature of the inmate's condition. (*Id.*)

21.     At ADX, officers conduct rounds every thirty minutes, which entails physically walking down the range to make sure all inmates are alive and well, and in no apparent distress. (*Id.*) After hours, there also an on-call physician. (*Id.*, ¶ 25; Att. 4 at 2.) This Medical Duty Officer (MDO) is on-call 24 hours a day, seven days a week, for emergencies or clinical consultations. (*Id.*, ¶ 25; Attach. 6, § 4.A.3.) While the MDO is not physically at ADX, he or she can be reached telephonically if there is a medical emergency. (*Id.*) The physician on-call schedule and contact information are given to Health Services staff as well as Correctional Services staff. (*Id.*; § 4.A.3.)

22.     On-site medical coverage at the ADX is provided from 6 a.m. to 10 p.m., including weekends and holidays. (*Id.*; § 4.A.2.) If an inmate requires emergent care after hours, the MDO is notified by Correctional Services of the nature of the medical complaint, and the MDO will provide further instructions (i.e., activate EMS, telephone triage, or defer examination until normal business

hours).  (*Id.*, ¶ 26; §§ 4.A.3, 4.B.2.)  In the event the MDO is unavailable, and an imminent loss of

life or limb situation occurs, the Operations Lieutenant is authorized to immediately call 911, so

timely emergent care can be provided.  (*Id.*; § 4.B.2.)  FCC Florence has a contract with American

Medical Response ("AMR") ambulance service, which is based in nearby Florence, Colorado, and

can respond within several minutes.  (*Id.*, ¶¶ 22, 26.)  An AMR ambulance is cleared to enter the

facility quickly to minimize response time; it proceeds directly to the rear gate where the patient can

be transferred into the ambulance.  (*Id.*, ¶ 26.)

23.     With respect to Plaintiff's diagnosis of Idiopathic Angioedema, Health Services staff

are capable of administering emergent doses of necessary medications to stabilize an inmate,

including the emergent administration of epinephrine or prednisone, as indicated.  (*Id.*, ¶ 27.)

24.     If Plaintiff were to experience a future, acute angioedema attack, ADX Health

Services is prepared to care for him promptly and appropriately, as described in previous paragraphs

detailing the ADX's emergent care protocol.  (*Id.*, ¶ 35.)  If Plaintiff requires medical care that

exceeds what ADX can provide, he could be designated to a Federal Medical Center.  (*Id.*, ¶ 36;

Attach. 7, Program Statement 6270.01, *Medical Designations and Referral Services for Federal

Prisons*.)  A medical re-designation is made "for inmates with an acute medical, surgical, or

psychiatric condition, or for those inmates who have chronic care needs that cannot be addressed" at

the current facility.  (Attach. 7 at 5.)  The protocol is that most acute care, if it requires

hospitalization, should be provided in a community hospital near the BOP facility.  (*Id.* at 6.)

25.     Medical staff at ADX could request that Plaintiff be transferred to a Bureau Medical

Referral Center (MRC) upon weighing the following considerations: his prognosis for continued

long-term treatment and rehabilitation; whether the necessary treatment required is not available in

the local community; whether ADX lacks the health care resources to provide the necessary follow-

up treatment; and whether there are overriding case management and/or security needs for the transfer.  (Ex. A, ¶ 36; Attach. 7 at 6.).

26.     Plaintiff's current medical concerns do not warrant a medical re-designation to a Bureau MRC, and Plaintiff can be properly cared for at ADX Florence.  (*Id.*)

***Plaintiff's Diagnoses***

27.     On September 10, 2003, BOP Regional Director R.E. Holt indicated that Plaintiff received care in the Chronic Care Clinic in the United States Penitentiary, in Georgia, to monitor his pre-existing medical diagnosis of childhood asthma and acquired angioedema.  (Resp., Ex. C.)  From his arrival at the ADX, Plaintiff self-reported a history of angioedema.  (Resp., Ex. A, ¶ 28; Attach. 1, at 91–92.)  Plaintiff has self-reported swelling of his lips, face, throat or other areas at numerous times during his incarceration at ADX.  (Attach. 1 at 5, 11, 13, 17–18, 23, 130, 216, 225, 231, 374, 378, 437, 516, 546, 551, 597, 602, 609, 613.)  In many of those encounters, Plaintiff was administered antihistamines that improved his symptoms.  (*Id.*)

28.     A previous Clinical Director at FCC Florence ordered tests which confirmed that Plaintiff does not have HAE.  (*Id.* at 216–219; 258, 259, 261, 263.)  The Clinical Director informed Plaintiff of these findings on or around October 28, 2010.  (*Id.* at 264.)

29.     Plaintiff's current medical conditions include, but are not limited to, hypertension, myopia, astigmatism, cataracts, and angioneurotic edema (non-inflammatory swelling).  (*Id.* at 645.) The latter condition was described by Dr. Wilson on September 28, 2012.  (*Id.* at 330–36, 645.) Plaintiff is currently prescribed 10 milligrams of amlodipine once daily, and 50 milligrams of metoprolol tartrate twice daily.  (Ex. A, ¶ 31.) Both medications are prescribed to treat his hypertension. (*Id.*, Attach. 1 at 652–53.)

30.     Plaintiff is able to purchase over the-counter antihistamines from the commissary, including loratadine, chlorpheniramine, and Nasacort.  (Ex. A, ¶ 31.)

31.     As with any medical provider, Health Services clinicians at the ADX must obtain informed consent from Plaintiff prior to providing treatment.  (*Id.*, ¶ 33.)  Plaintiff frequently refuses treatment.  (*Id.*; Attach. 1 at 131–33, 377, 397, 412, 414, 432, 481, 488, 516, 537, 539, 550, 564, 576, 581, 583, 586, 682, 685, 689.)

***Specific Medical Incidents Related to Angioedema and Related Responses***

32.     On June 14, 2007, at approximately 2:30 a.m., Plaintiff suffered from an angioedema attack in which there was swelling to Plaintiff's upper and lower lips on the left side.  (Resp., Ex. B at 17.)  Plaintiff notified the correctional officer who notified a medical provider.  (*Id.*)  Plaintiff was not provided assistance for fifteen minutes as the medical provider was assisting another inmate. (*Id.*)

33.     On February 21, 2013, Plaintiff told a medical provider he "passed out" in his jail cell because of his angioedema.  (*Id.* at 378.)  Plaintiff was evaluated and did not receive any treatment or medication for angioedema. (*Id.*)

34.     On June 27, 2014, Plaintiff complained to a medical provider of swelling of his upper lip, itching all over his body, the appearance of hives, and tightness in his throat for two days due to stress.  (*Id.* at 437.)  Plaintiff advised that he had not taken his blood pressure medication as he was afraid it might aggravate his angioedema symptoms.  (*Id.*)

35.     On July 3, 2016, Plaintiff was found on the floor of his cell not responding to staff for about a minute.  (*Id.* at 551.)  His lips were swollen but he had no swelling to his tongue or throat. (*Id.*)

*Defendant's Expert*

36.     The medical evidence supports a finding that Plaintiff suffers from a mild form of Idiopathic Angioedema/Urticaria, rather than Hereditary Angioedema.  (Ex. B, Decl. of Alan L. Schocket, M.D., ¶¶ 5, 12.)

37.     Plaintiff's episodes of swelling are often short-lived (hours to a day) sometimes resolve without treatment and consistently respond to treatment with antihistamines like Benadryl. (*Id.*, ¶ 11.)  Plaintiff's intermittent Idiopathic Angioedema/Urticaria is responsive to antihistamines and epinephrine.  (*Id.*, ¶ 12.)

38.     The relatively infrequent occurrence and rapid resolution of Plaintiff's episodes with little or no sequelae support the adequate treatment afforded him by the federal prison system.  (*Id.*, ¶ 14.)  Plaintiff was treated with and provided access to antihistamines in the prison facility. (*Id.*, ¶ 15.) These medications are the cornerstone of treatment for Idiopathic Angioedema and Urticaria.  (*Id.*)

39.     The episodes of swelling Plaintiff has experienced in the past have resolved following treatment.  (*Id.*, ¶ 17.)

40.     The care that Plaintiff has received from the Bureau of Prisons for his Idiopathic Angioedema has been appropriate to manage his disease.  (*Id.*, ¶ 20.)

## STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works, Inc. v. City & County of Denver*,

36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party

may not rest solely on the allegations in the pleadings, but must instead designate "specific facts

showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P.

56(c). A disputed fact is "material" if "under the substantive law it is essential to the proper

disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998)

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the

evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.

*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S.

at 248).

When ruling on a motion for summary judgment, a court may consider only admissible

evidence. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010). The

factual record and reasonable inferences therefrom are viewed in the light most favorable to the

party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. At the summary

judgment stage of litigation, a plaintiff's version of the facts must find support in the record.

*Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell

two different stories, one of which is blatantly contradicted by the record, so that no reasonable

jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a

motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d

at 1312. "[F]acts must be viewed in the light most favorable to the nonmoving party only if

there is a 'genuine' dispute as to those facts." *Scott*, 550 U.S. at 380.

**ANALYSIS**

*A.       Eighth Amendment*

The Eighth Amendment to the United States Constitution provides that "cruel and unusual punishments" shall not be inflicted.  U.S. Const. amend. VIII.  Punishments that "involve the unnecessary and wanton infliction of pain" violate this provision.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  Because "[a]n inmate must rely on prison authorities to treat his medical needs," *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), the Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104 (quoting *Gregg*, 428 U.S. at 173).  Generally, the court's analysis of Plaintiff's Eighth Amendment claims involves both an objective and subjective component.  *Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991). The objective component is met if the harm suffered is sufficiently serious.  *Id.* at 298.  The subjective component requires an inquiry into the state actor's culpability.  *Mata v. Saiz*, 427 F.3d 751, 753 (10th Cir.2005).

*1.       Medical Conditions Other than Angioedema*

At the outset, the court notes that in his Response, Plaintiff asserts he suffers from "asthma, back pain, dental issues, high blood pressure, hypertension, myopia, astigmatism, cataracts, and has experienced epilepsy, seizures and convulsions." (Resp. at 15.)  However, there is no mention of back pain, epilepsy, seizures, or convulsions in Plaintiff's Second Amended Complaint, and no allegations that Defendant has failed to treat any of these conditions.  (*See* Am. Compl.)  Moreover, Plaintiff has not provided any expert opinions or evidence that he suffers from or that Defendant has failed to treat these conditions.

Furthermore, though Plaintiff does allege in his Second Amended Complaint that he suffers from dental issues for which the defendant has delayed dental treatment (*see id.*, ¶¶ 134–35, 142–43, 165–66), he suffers from hypertension that is poorly controlled by the defendant (*id.*, ¶¶ 6, 32, 58, 92), and he suffers from vision problems (*id.*, ¶¶ 6, 157), again he fails to provide any expert opinions or evidence that these are sufficiently serious medical problems or that Defendant has failed to provide treatment for them.

Finally, Plaintiff alleges in his Second Amended Complaint that he suffers from "occasional asthma." (*Id.*, ¶ 32.) However, Dr. Busse addressed Plaintiff's asthma only to indicate it is "less of an [i]ssue tha[n] his angioedema based upon the infrequency of his asthma symptoms. However, his care can be optimized by having visits with spirometry to access his lung function and also a Rx for a rescue inhaler such as Albuterol." (Resp., Ex. G at 2.) Plaintiff has filed to provide any evidence that Plaintiff's asthma is a sufficiently serious condition for which he has not received treatment.

Defendant is entitled to summary judgment on Plaintiff's claims related to asthma, back pain, dental issues, high blood pressure, vision problems, epilepsy, seizures, and convulsions.

### 2. *Angioedema*

#### a. *Objective Component*

Defendant argues Plaintiff is unable to establish that he suffers from a serious medical condition to meet the objective component of a deliberate indifference claim. (Mot. at 17–18.)

"A medical need is [sufficiently] serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily

18

recognize the necessity for a doctor's attention." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (internal quotations omitted).

It is undisputed that Plaintiff has not been diagnosed with Hereditary Angioedema, but that he, instead, has Idiopathic Angioedema. Defendant argues that

> Plaintiff's medical records do not contain evidence that he has suffered any acute, life-threatening episode of Idiopathic Angioedema. Plaintiff's reported symptoms are relatively mild and amenable to treatment to resolve the episodes. Plaintiff's Idiopathic Angioedema does not require daily medication.

(*Id.* [internal citations omitted].) However, Dr. Busse, Plaintiff's expert, opines that Ideopathic Angioedema "can be potentially life-threatening" (Resp., Ex. H [Busse Rebuttal Op.] at 2.)

Defendant disputes Dr. Busse's opinions on the bases that the symptoms Plaintiff attributes to angioedema are self-reported and that "Plaintiff is unable to point to any entry in his medical record that he was diagnosed with a recent, life-threatening, emergent condition" to which BOP medical staff have not responded or ameliorated his medical condition with treatment. (Reply at 9–10.) Indeed, most of the medical records Plaintiff cites in support of his claims that his angioedema is a life-threatening condition either do not mention angioedema or are attributed to Plaintiff's other medical conditions. (*See* Resp., Statement of Additional Disputed or Undisputed Material Facts [Pl.'s Facts], ¶¶ 7–11, 15–19, 24, 28–31, 33, 35.) However, Plaintiff's medical records show that on July 3, 2016, he was found on the floor of his cell not responding to staff for about a minute. (*Id.* at 551.) Though Plaintiff did not have swelling to his tongue or throat, he did have swollen lips, which the medical provider attributed to angioedema. (*Id* at 551–52.)

The court finds that there are disputed issues of fact regarding whether Plaintiff has a sufficiently serious medical need.

### b.       *Municipal Liability and Objective Standard*

Defendant also argues that, as an entity, it cannot be liable for the acts of its employees unless it has the subjective, culpable intent required to hold it liable for an Eighth Amendment violation.  (*See* Mot. at 17–18.)  Though Defendant is incorrect about the standard under which Eighth Amendment deliberate indifference claims asserting municipal liability is viewed, Defendant is correct that it cannot be held liable for the claims asserted by the plaintiff.

While a subjective standard applies to prison condition claims against an individual official, an objective standard applies to claims against municipalities because "considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official."  *Farmer v. Brennan*, 511 U.S. 825, 841–42 (1994); *see Barney v. Pulsipher*, 143 F.3d 1299, 1307 n.5 (10th Cir. 1998).  Vicarious liability is not a permissible avenue for relief against a governmental entity under 42 U.S.C. § 1983. *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010); *Cacioppo v. Town of Vail, Colo.*, 528 F. App'x 929, 931 (10th Cir. 2013).  Liability may be imposed only "for [the entity's] own unconstitutional or illegal policies and not for the tortious acts of its employees."  *Barney*, 143 F.3d 1299, 1307 (10th Cir. 1998).  The Supreme Court, in *Monell v. Department of Social Services*, 436 U.S. 658, 691–692 (1978), stated a plaintiff must identify "a government's policy or custom" that caused the injury.  The policy or custom must be shown to be the direct cause or "moving force" behind the constitutional violations.  *City of Canton v. Harris*, 489 U.S. 378, 389, 109 (1989).

"[W]hen an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to

the question." *Barney*, 143 F.3d at 1307 (citing *Bd of Cnty. Comm'rs v. Brown*, 520 U.S. 397,

404 (1997). However, in situations where "the p.olicy at issue is lawful on its face and the

municipality therefore has not directly inflicted the injury through its own actions . . . 'rigorous

standards of culpability and causation must be applied to ensure that the municipality is not held

liable solely for the actions of its employee.' " *Id.* (quoting *Brown*, 520 U.S. at 405).

> In [*Harris*], the Supreme Court held that municipal liability based on a policy of inadequate training requires proof of the municipality's "deliberate indifference" to its inhabitants—i.e., the failure to train must "reflect [ ] a 'deliberate' or 'conscious' choice by a municipality." [489 U.S.] at 389. The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. *See Brown*, 520 U.S. at [407]. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. *Id.* [at 407–08]. In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations. *Brown*, 520 U.S. at [409]; *Canton*, 489 U.S. at 390 & n. 10.

*Barney*, 143 F.3d at 1307–08.

Here, Plaintiff does not allege that any specific policy violates a federal law or that

Defendant had actual notice of an alleged constitutional violation. Rather, Plaintiff alleges

Defendant "is 'consistent' at providing 'inconsistent' medical care" for Plaintiff's serious

medical condition of Angioedema by acting "pursuant to federal custom, policy, or practice in

their acts and omissions pertaining to [Plaintiff's] inadequate medical care . . . ." (Am. Compl.,

¶¶ 12, 185.) Though entirely unclear, Plaintiff's claim appears to be that Defendant had

constructive notice of the alleged constitutional violations. In his response, Plaintiff argues that

Defendant failed to

(1) consistently provide medical staff and medical treatment; (2) employ medical staff that have the capability of providing Plaintiff with adequate medical treatment; (3) establish an emergency plan or protocol to assist with responding to medical emergencies of Plaintiff; (4) retain the appropriate medications for emergency treatment; and (5) acknowledge Plaintiff's symptoms as an angioedema and provide treatment thereof.

(Resp. at 17.)  The court addresses each of Plaintiff's argument in turn.

### i. *Providing Medical Staff and Medical Treatment*

Plaintiff argues Defendant's medical staff failed to be consistently available to treat Plaintiff during his serious medical emergencies, as there is no medical staff available for emergency treatment overnight and there is not a physician in ADX at all times.  (*Id.* at 18.)  In his Statement of Additional Disputed or Undisputed Material Facts, Plaintiff provides the following examples of four delays in treatment:

1. Plaintiff states that on March 27, 2007, he activated the duress button in his cell as he experienced severe chest pain and discomfort to his arms.  (Resp., Pl.'s Facts, ¶ 9.)  Plaintiff contends that, upon the correctional officer's arrival, he was found unconscious in his cell and had to be resuscitated.  (*Id.*, ¶ 10.)  However, the record to which Plaintiff cites shows that Plaintiff denied losing consciousness.  (*See* Mot., Ex. A, Attach. 1 at 22.)  There is no indication in the record that Plaintiff had been found unconscious or that he had to be resuscitated.  (*See id.*)
2. On June 14, 2007, at approximately 2:30 a.m., Plaintiff suffered from an angioedema attack in which there was swelling to Plaintiff's upper and lower lips on the left side.  (Resp., Ex. B at 17.)  Plaintiff was not provided assistance for fifteen minutes as the medical provider was assisting another inmate.  (*Id.*)
3. Plaintiff states that on January 1, 2010, he experienced chest pain and notified a correctional officer, but medical treatment was delayed as the medical provider was treating another inmate.  (Resp., Pl.'s Facts, ¶¶ 16–17.)  The record to which Plaintiff cites indicates that when the provider arrived, Plaintiff "was sleeping [and] he states that he had chest pain earlier but it has gone away now and he feels fine."  (Mot., Ex. A, Attach. 4 at 1.)  There is no indication in the record as to how long Plaintiff waited to be seen by a medical provider.
4. Plaintiff states on January 29, 2010, he experienced chest pain and activated the duress button, but again his treatment was delayed as the only health technician on duty was assisting another inmate.  (Resp., Pl.'s Facts, ¶¶ 18–19.)  However, the medical record shows that, though he was not seen by a medical provider immediately, officers checked on him several times.  (Mot., Ex. A, Attach. 5 at 26.)

Again, there is no indication in the record as to how long Plaintiff waited to be seen by a medical provider.

The court notes that Plaintiff does not provide any examples of when his medical care has been delayed since January 2010. Thus, Plaintiff has provided no factual support for his contention in his response that "from 2011 through 2015, there was only one physician assistant at ADX who was responsible for providing treatment to over 400 inmates," and, thus, during that time period, when Plaintiff had medical emergencies his care was delayed or denied due to the unavailability of medical staff. (Resp. at 18.) Plaintiff also has provided no factual support for his contention that his medical care has been delayed since 2015. Finally, Plaintiff has provided no factual support for his contention that he is not able to receive emergency treatment overnight.

Plaintiff's allegation that medical attention was delayed for unknown periods of time on four occasions from 2007 to the present does not constitute a pattern of tortious conduct sufficient to subject the defendant to liability. *See Blueberry v. Comanche Cnty. Facilities Auth.,* 672 F. App'x 814, 817 (10th Cir. 2016) (evidence of three incidents of sexual misconduct that occurred within about four years of the alleged misconduct underlying the plaintiffs' claims did not establish a pattern of tortious conduct). Finally, a delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm. *See Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993). Plaintiff does not allege any harm came from the delays he references.

### ii. *Properly Trained Staff*

Plaintiff contends that "Defendant's medical staff is not properly trained to adequately treat Plaintiff." (Resp. at 18.)

Although Plaintiff does not identify BOP Physician's Assistant Anthony Osagie by name in his argument, Plaintiff states that a "medical provider of Defendant has no training or education of Plaintiff's medical condition of angioedema, and has no license to practice medicine in the United States." (*Id.*) Plaintiff's criticism of Mr. Osagie's medical qualifications and practice, however, is not supported by admissible expert medical evidence, and Plaintiff is not qualified to opine on the adequacy of Mr. Osagie's medical qualifications or medical care. Plaintiff also has provided no factual support for his contention that any other medical staff member is not adequately trained.

Plaintiff has not demonstrated a pattern of violations regarding this allegation.

### iii.    *Emergency Plan or Protocol*

Plaintiff argues he "has had frequent medical emergencies while in the care and custody of [Defendant], including difficulty breathing, loss of consciousness and a need for resuscitation. Despite this fact, Defendant has not established an emergency plan or protocol to assist with responding to medical emergencies of Plaintiff." (Resp. at 18.)

Defendant has policies and procedures in place to deal with any inmate's medical emergency, as detailed in paragraphs 17 through 25 of the Undisputed Facts. Plaintiff does not provide any factual support or expert opinion evidence for his contention that Defendant's current procedures are insufficient.

Thus, Plaintiff also has not demonstrated a pattern of violations regarding this allegation.

### iv.    *Availability of EpiPen*

Plaintiff contends that Dr. Paul Busse and Dr. Mitchell Boxer have opined that Plaintiff "should be provided with an Epi[P]en or emergency kit to remain on his person or be quickly

accessible at all times." (Resp. at 18.) Plaintiff argues that Defendant has not provided the same and, thus, Plaintiff has to be transported to another facility to access an EpiPen. (*Id.*) Moreover, Plaintiff argues, "even if an Epi[P]en was available at ADX, medical providers are not certified or trained to administer it." (*Id.*)

As to Plaintiff's argument that ADX medical providers are not certified or trained to administer an EpiPen, Plaintiff provides evidence of only one medical provider who has not been trained to use an EpiPen. (*See id.*, Pl.'s Facts, ¶ 46.) Thus, Plaintiff's conclusory contention is unavailing. Rather, it is undisputed that the ADX Health Services staff are capable of administering emergent doses of necessary medications to stabilize an inmate, including the emergent administration of epinephrine or prednisone. (*See* Undisputed Facts, ¶ 23.)

Plaintiff has not shown a "pattern of tortious conduct" regarding Defendant's failure to provide an EpiPen, nor has Plaintiff shown that Defendant's violation of Plaintiff's Eighth Amendment rights is a "highly predictable" or "plainly obvious" consequence of Defendant's failure to provide an EpiPen. *Brown*, 520 U.S. at 409. In his expert report, Dr. Boxer states that, in the event of "significant upper airway obstruction" caused by swelling of the tongue or throat, "the administration of an EpiPen would be necessary." (Resp., Ex. B at 2.) However, Dr. Busse opines that Plaintiff "should have ready access to epinephrine." (*Id.*, Ex. H at 2.) According to the EpiPen website, EpiPen is an epinephrine injection.[3] As such, Plaintiff's experts agree that

---

[3] The court may, *sua sponte*, "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2), (c)(1). "It is not uncommon for courts to take judicial notice of factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) (citing *City of Monroe Emps Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 655 n.1 (6th Cir. 2005) (taking judicial notice of a term defined on the website of the National Association of Securities Dealers, Inc.); *Schaffer v.*

Plaintiff should have epinephrine available; the difference in their opinions is only in the method by which it should be administered. Thus, based on the conflicting opinions of Plaintiff's own experts, it cannot be said that it is "highly predictable" or "plainly obvious" that Defendant's failure to provide an EpiPen for Plaintiff "is substantially certain to result in a constitutional violation," or that Defendant has " consciously or deliberately" chosen "to disregard the risk of harm." *Brown*, 520 U.S. at 409; *Barney*, 143 F.3d at 1307.

### v.     *Acknowledge Angioedema Symptoms and Provide Treatment*

Finally, Plaintiff contends that he "has persistently reported to Defendant that his symptoms of swelling, hives, and itching were a result of his condition of angioedema[, yet] Defendant ignored this fact and refused to notate Plaintiff's assertions in his medical records, . . . [instead notating] it as an 'allergic response.' Consequently, Plaintiff was not provided any appropriate treatment or medication for his angioedema." (Resp. at 18–19.)

Plaintiff provides the following examples in which he alleges he did not receive proper treatment or medication for his Angioedema:

1. On April 26, 2010, a medical provider of Defendant stated that while speaking with Plaintiff she "notice[d] his upper lip swelling slightly… [and] observed two raised hives on inside of right AC area." (Mot., Ex. A, Attach. 5 at 18.) Plaintiff states that "the incident was reported as an 'allergic response' and 'hypertensive', rather than the angioedema that [he] reported." (Resp., Pl.'s Statement, ¶ 21.) The medical record reflects that Plaintiff took two antihistamine tablets, and "[a]fter several minutes [of lying down] he belched twice, then stated he felt much better." (*Id.*)
2. On February 21, 2013, Plaintiff states he "lost consciousness in his jail cell" and "advised the medical provider that the same was caused by his angioedema." (Resp., Pl.'s Statement, ¶ 26.) Plaintiff states his blood pressure was evaluated, but he did not receive any treatment or medication for angioedema. (*Id.*, ¶ 27.) The medical provider noted, "Inmate reportedly passed out earlier, but looks stable at this time."

*Clinton*, 240 F.3d 878, 885 n.8 (10th Cir. 2001) (taking judicial notice of information found in a political reference almanac and citing to the almanac's website). The court takes judicial notice of the this fact on the EpiPen website, https://www.epipen.com/en.

(Mot., Ex. A, Attach. 8 at 9.)  The provider examined Plaintiff, noting that he was "Alert and Oriented," his neck was "Supple, Symmetric, Trachea Midline," his pulmonary function was normal, and had a normal cardiovascular rhythm.  (*Id.* at 8–9.)  Plaintiff "was instructed to take his [blood pressure] meds. in front of [the provider] and he did; counseled on compliance."  (*Id.* at 9.)

Again, Plaintiff's allegations that he did not receive medication on two occasions from 2007 to the present does not constitute a pattern of tortious conduct sufficient to subject the defendant to liability.  *See Blueberry*, 672 F. App'x 814, 817.  Moreover, Plaintiff points to Dr. Busse's opinion that "treatment for [Plaintiff's] Idiopathic Angioedema has not been optimized" (Resp., Ex. G at 1); however, as to medications, Dr. Busse stated that, "Appropriate treatment includes preventative daily non-sedating anti-histamines like Zyrtec, Claritin, Allegra taken anywhere between [every day and four times per day] dosing."  (*Id.* at 2.)  Loratadine is the generic equivalent of Claritin,[4] and it is undisputed that Plaintiff is able to purchase over the-counter antihistamines from the commissary, including loratadine, chlorpheniramine, and Nasacort.  (Mot., Ex. A, ¶ 31.)  Finally, Plaintiff has provided no evidence or factual support that Plaintiff's medical treatment during these incidents was improper.  A plaintiff's disagreements with the treatment provided by prison medical staff do not in themselves rise to the level of deliberate indifference necessary to violate the Eighth Amendment.  *See Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999).

### 3.    *Conclusion Regarding Plaintiff's Eighth Amendment Claim*

Plaintiff has failed to showing that there is a genuine issue for trial on his Eighth Amendment deliberate indifference claim.  *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).  Thus, Defendant is entitled to summary judgment.

_____

[4] *See* https://www.webmd.com/drugs/2/drug-5346-204/claritin-oral/loratadine-oral/details, of which the court takes judicial notice.

***B.***     ***Injunctive and Declaratory Relief***

Defendant argues that Plaintiff cannot establish a basis for prospective injunctive relief. (Mot. at 49.)

Plaintiff lacks standing to sue for an injunction under *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), because Plaintiff fails to establish "the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." *Id.* at 103. "The threatened injury must be 'certainly impending' and not merely speculative." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). As the court has determined Defendant is entitled to summary judgment because Plaintiff has not established that he has suffered a constitutional violation due to any unconstitutional custom or policy, he is not entitled to injunctive relief.

Similarly, it is well established that the Declaratory Judgment Act is remedial and does not itself confer jurisdiction on federal courts, *Wyoming v. United States*, 279 F.3d 1214, 1225 (10th Cir. 2002), and that Plaintiff must establish an Article III case or controversy as a prerequisite for declaratory relief, *see Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–41 617 (1937). The abstract possibility that Plaintiff may have an episode of Angioedema for which he is not given what he considers to be appropriate treatment in the future certainly does not satisfy Article III's requirements.

**WHEREFORE**, for the foregoing reasons, it is

**ORDERED** that "Defendant's Motion for Summary Judgment and Memorandum Brief in Support Thereof" (Doc. No. 49) is **GRANTED**; it is further

**ORDERED** that judgment shall enter in favor of Defendant and against Plaintiff on all claims for relief and causes of action asserted in this case; it is further

**ORDERED** that Defendant is awarded their costs to be taxed by the Clerk of Court in the time and manner prescribed by Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1; it is further

**ORDERED** that this case is **CLOSED**.

Dated this 22nd day of March, 2018.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge